**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KRISTI KAE KIEFER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 12-1273 |
| v. | ) | Judge Nora Barry Fischer/ |
| | ) | Magistrate Judge Maureen Kelly |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | Re: ECF Nos. 17 and 21 |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Kristi Kae Kiefer ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act").  42 U.S.C. §§ 401-403; 1381-1383f.  This matter is before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56.  (ECF Nos. 17, 21).  For the reasons that follow, it is respectfully recommended that Plaintiff's motion for summary judgment (ECF No. 17) be denied, that Defendant's motion for summary judgment (ECF No. 21) be granted, and that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On April 13, 2009, Plaintiff applied for DIB and SSI alleging that she became disabled on October 7, 2006. (R. at 137-140).[1]  Her alleged disabling impairments were depression, anxiety, right wrist pain, hip pain, and hepatitis C.  (R. at 60).  Both claims were denied on June

---

[1] Citations to the ECF Nos. 16-1 through 16-10, the Record, *hereinafter*, "R. at _."

25, 2009. (R. at 73, 85). An administrative hearing was held on October 15, 2010 before Administrative Law Judge ("ALJ") John Porter. (R. at 33). Plaintiff's claims were denied by the ALJ in a decision dated January 27, 2011. (R. at 16-26). On June 27, 2012, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, at which time the ALJ's decision became the final decision of the Commissioner. (R. at 1). Plaintiff filed a complaint in this Court on September 14, 2012. (ECF No. 3). Plaintiff and Defendant filed motions for summary judgment on September 23, 2013 and November 22, 2013, respectively. (ECF Nos. 17, 21). The cross-motions for summary judgment are now ripe for consideration.

## III.   STATEMENT OF THE CASE

### A.   Employment History

Plaintiff worked as a waitress from April of 1994 to November of 2005 (medium work, unskilled). (R. at 51-52, 161). She worked as a merchandise processor from February of 2006 to October 17, 2006 (light to medium work, unskilled). (*Id.*). On her disability report form she indicated that she quit working because she "couldn't do it anymore." (R. at 160).

### B.   Medical Treatment History

#### 1.   Hepatitis C

Plaintiff was seen by Donald A. Walters, D.O., on September 30, 2008. (R. at 220). Dr. Walters ordered tests to rule out hepatitis C. (*Id.*). She returned on October 23, 2008 and Dr. Walters concluded that she was not infected with the hepatitis C virus at that time. (R. at 217). Dr. Walters cautioned that Plaintiff could become infected again if she was re-exposed. (*Id.*).

#### 2.   Mental Health

Plaintiff was treated in the Emergency Department at Butler Memorial Hospital ("Butler Memorial") on October 13, 2006 after she abruptly stopped taking four prescribed medications: Valium, Klonopin, Effexor and Seroquel. (R. at 278-279). She was diagnosed with anxiety and

medication noncompliance. (R. at 282). Plaintiff was discharged with instructions to call her psychiatrist. (R. at 284).

Two months later, on December 18, 2006, Plaintiff was transported by ambulance and involuntarily admitted to Butler Memorial. (R. at 264-268, 274). She was diagnosed with polysubstance dependence. (R. at 269).

Plaintiff was admitted to a drug and alcohol treatment program at Glade Run Lutheran Services ("Glade Run") on June 30, 2008. (R. at 199). She continued with the program as an outpatient through 2010. (R. at 313). As part of the Glade Run program, Linda Humphreys, M.D., a board certified psychiatrist, completed a Psychiatric Evaluation of Plaintiff on August 27, 2008. (R. at 199). Dr. Humphreys thoroughly documented Plaintiff's past psychiatric history, including her extensive history of drug use.[2] (*Id.*). Plaintiff started drinking alcohol when she was fourteen years old and later began smoking marijuana. (*Id.*). She developed a habit of snorting OxyContin and five years later she began using heroin intravenously. (*Id.*). Dr. Humphreys noted that from April 10, 2003 to December 16, 2006, Plaintiff was receiving drug and alcohol counseling at Irene Stacy Community Mental Health Center but was thrown out of the program because she was stealing on the premises. (*Id.*). Dr. Humphreys also noted that, from the age of 14 until 31, her age at the time of the evaluation, Plaintiff had participated in numerous other inpatient and outpatient drug and alcohol rehabilitation programs. (*Id.*).

Dr. Humphreys conducted a mental status examination of Plaintiff. Dr. Humphreys observed that Plaintiff was alert and fully oriented with a euthymic[3] mood and affect. (R. at

---

[2]  "An individual shall not be considered to be disabled … if alcoholism or drug addiction would … be a contributing factor material to the [ALJ]'s determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The ALJ must have found the claimant to be disabled before the effect of alcoholism may be considered. *Parks v. Comm'r of Soc. Sec.*, 401 F. App'x. 651, 656 (3d Cir. 2010).

[3]  "Euthymia" is defined as "[j]oyfullness, mental peace and tranquility [or] [m]oderation of mood, not manic or depressed." STEDMAN'S MEDICAL DICTIONARY 678 (28th ed. 2005).

200).  Plaintiff denied any symptoms from severe depression but stated "[s]ome days I get down."  (*Id.*).  She reported symptoms of Obsessive-Compulsive Disorder ("OCD") including: excessive hand washing; worrying she would infect somebody with an unknown disease contracted while sharing needles; checking to make sure doors were closed; and making certain that her dog was ok.  (*Id.*).  Her cognitive function was within normal limits and she was proud of her sobriety.  (*Id.*).

Dr. Humphreys found no evidence of Bipolar Affective Disorder.  (R. at 201).  Plaintiff's history of impulsivity and high-risk behaviors was potentially attributed to Attention Deficit Hyperactivity Disorder ("ADHD") coupled with OCD traits.  (*Id.*).  Dr. Humphreys diagnosed Plaintiff with the following:  ADHD, combined type; Opioid Dependence, early recovery; rule-out OCD; OCD personality traits; and hypothyroidism[4].  (R. at 201).  Her current and highest Global Assessment Functioning[5] score for the past year was 48.[6]  (*Id.*).  Continued outpatient therapy, aerobic exercise and a trial of Strattera[7] were recommended.  (*Id.*).

---

[4]  "Hypothyroidism (underactive thyroid) is a condition in which your thyroid gland doesn't produced enough of certain hormones . . . [and] over time . . . can cause a number of health problems."  Mayo Clinic, Hypothyroidism, *available at*  http://www.mayoclinic.org/diseases-conditions/hypothyroidism/basics/definition/con-20021179  (last visited March 11, 2014).

[5]  Global Assessment of Functioning is a numeric score ranging from 0 to 100 reported on Axis V of the Multiaxial Assessment. American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV-TR) 32–33 (4th ed. 2000). The "Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact, and in predicting outcome." *Id.*

[6]  A GAF score of 41 – 50 may indicate "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*

[7]  Strattera (generic name "Atomoxetine") is prescribed "to treat attention-deficit hyperactivity disorder (ADHD)." Mayo Clinic, Atomoxetine, *available at* http://www.mayoclinic.org/drugs-supplements/atomoxetine-oral-route/description/drg-20066904 (last visit March 31, 2014).

After the initial evaluation, Plaintiff was seen on an ongoing basis by Patricia Thomas, M.A., her assigned therapist at Glade Run. (R. at 335). Plaintiff was seen periodically by Dr. Humphreys.

On November 3, 2008, Plaintiff was again seen by Dr. Humphreys at Glade Run. (R. at 198). Plaintiff stated that she was feeling better and had tested negative for hepatitis. (R. at 198). On June 17, 2009, Therapist Thomas noted that Plaintiff's OCD traits had diminished. (R. at 335). Plaintiff was not able to get a full night of sleep. (*Id.*). Plaintiff reported increased frustration, difficulty concentrating, and depression. (*Id.*).

On August 13, 2009, Plaintiff told Dr. Humphreys "my life's good now." (R. at 334). She experienced periods of agitation, racing thoughts, and anger. (*Id.*). Plaintiff also reported that she was resuming classes in the fall. (*Id.*). Dr. Humphreys noted that Plaintiff had maintained her sobriety for eighteen months. (*Id.*). Therapist Thomas noted on August 13, 2009 that Plaintiff suffered from racing thoughts, depression, and difficulty concentrating but was maintaining sobriety. (R. at 333). Dr. Humphreys signed a psychiatric evaluation on August 13, 2009. (R. at 330-332). This evaluation is identical to the evaluation she signed on August 27, 2008. (R. at 199, 330-332). It appears to be have been reprinted and assigned a new date. (R. at 199, 330).

A note completed by Dr. Humphreys on August 27, 2009 indicated that Plaintiff's moods were "up and down" - "a bit more" down than up. (R. at 329). Plaintiff was prescribed Wellbutrin.[8] (*Id.*). On September 23, 2009, she complained to Dr. Humphreys and Therapist Thomas that Wellbutrin made her nauseous and she had stopped taking it. (R. at 326-327). Her

---

[8] Wellbutrin (generic name "Bupropion") "is used to treat depression." Mayo Clinic, Bupropion, *available at* http://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/drg-20062478 (last visited March 11, 2014).

OCD was "much better" but she suffered from erratic sleep. (*Id.*). Dr. Humphreys prescribed Seroquel.[9] (R. at 327). Seroquel was effective in controlling Plaintiff's racing thoughts and helped her sleep. (R. at 323). In October, 2009, she reported difficulty focusing in school and Dr. Humphreys prescribed Tenex[10] to treat ADHD. (R. at 323-324). On October 30, 2009 she told Therapist Thomas that "school is not for her." (R. at 322). Therapist Thomas noted that Plaintiff did not report any attention problems. (*Id.*). On November 23, 2009, Plaintiff told Dr. Humphreys that school was "better" and she was not as moody. (R. at 321). On January 28, 2010, Plaintiff reported that she stopped taking Tenex due to "excessive fatigue". (R. at 319). She saw improvement after her dosage of Synthroid was increased. (*Id.*). From January through April 2010, Therapist Thomas noted that Plaintiff was doing well in school (R. at 316). Financial difficulties in April 2010 forced her to cut back on Suboxone and she was feeling tired. (*Id.*).

On April 23, 2010, Plaintiff told Dr. Humphries that her boyfriend attempted to strangle her and her mother kicked her out of the house. (R. at 314). Her ex-boyfriend was arrested on drug charges and Plaintiff was charged with assault stemming from their domestic altercation. (R. at 314-316). She found a new place to live and was looking for work. (*Id.*).

On June 3, 2010 Plaintiff did not show for her appointment with Dr. Humphreys. (R. at 312). Dr. Humphreys noted that given Plaintiff's recent problems and interpersonal conflicts the possibility of a substance abuse relapse must be considered. (R. at 312). Therapist Thomas spoke with Plaintiff who reported that she had gone off her medications and flunked out of

---

[9]     Seroquel (generic name "Quetiapine"), "is used to treat nervous, emotional, and mental conditions (e.g., schizophrenia). Mayo Clinic, Quetiapine, *available at* http://www.mayoclinic.org/drugs-supplements/quetiapine-oral-route/description/DRG-20066912 (last visited March 11, 2014).

[10]     Tenex (generic name "Guanfacine") is used "alone or together with other medicines to treat attention deficit hyperactivity disorder (ADHD)." Mayo Clinic, Guanfacine, *available at* http://www.mayoclinic.org/drugs-supplements/guanfacine-oral-route/description/drg-20064131 (last visited March 11, 2014).

school for the semester.  (R. at 311).  After failing to return to Glade Run for treatment, Plaintiff was discharged from treatment at Glade Run on September 15, 2010.  (R. at 309).  Her whereabouts were listed as "unknown."  (*Id.*).

While Plaintiff was receiving treatment at Glade Run, she was also seen by psychologists Martin Meyer, Ph.D., and Julie Uran, Ph.D., of Vocational Psychological Services, on May 13, 2009.  (R. at 377).  Plaintiff's Intelligence Quotient ("IQ") was assessed as follows: a verbal IQ of 76 (fifth percentile); a performance IQ of 85 (sixteenth percentile); and a full scale IQ of 78 (seventh percentile).  (R. at 377).  A letter by Dr. Meyer and Dr. Uran to Plaintiff's attorney stated that a "pragmatic interpretation of these results suggests an individual with below average intelligence and expectations would be that she would be slow in assimilating new information." (*Id.*).

### 3.  Heroin Addiction

On December 3, 2008, soon after commencing participation in the Glade Run treatment program in June 2008, Plaintiff began medical treatment for heroin addiction with Richard Schollaert, M.D., of Sewickley Valley Medical Group Internal Medicine Associates.  (R. at 206). She was prescribed Suboxone.[11]  (R. at 205).  On January 2, 2009, Plaintiff reported to Dr. Schollaert that she was "felling well."  (*Id.*).  At her next visit on February 26, 2009 Plaintiff's condition remained "well."  (R. at 204).  She returned on April 24, 2009 reporting that she was "generally feeling well" and had not used narcotics.  (R. at 204).

---

[11]  Suboxone (generic name "Buprenorphine") "is used to treat opioid (narcotic) dependence or addiction."  Mayo Clinic, Buprenorphine, *available at* http://www.mayoclinic.org/drugs-supplements/buprenorphine-and-naloxone-sublingual-route/description/drg-20074097 (last visited March 11, 2014).

On June 23, 2009, Plaintiff stated that she was pregnant. (R. at 345). Dr. Schollaert discussed treatment with Subutex[12] and the possibility of tapering off Suboxone but she did not think she was ready. (*Id.*). On August 18, 2009, Plaintiff told Dr. Schollaert that she had suffered a miscarriage. (*Id.*). Her medications were not changed. (*Id.*). On October 15, 2009, Plaintiff had started school again and was "feel[ing] well." (R. at 344). She returned on December 11, 2009 complaining of stress from school. (R. at 343). Dr. Schollaert opined that she appeared to be "doing well and feeling a lot better about herself." (*Id.*). On February 5, 2010, Plaintiff reported that she was feeling depressed and was thinking of dropping out of school. (*Id.*). She was prescribed Zoloft and instructed to call the doctor in three weeks to report her progress. (*Id.*). Dr. Schollaert's notes from April 2, 2010 indicate that Plaintiff was feeling better, her depression was improved, and she was attending school. (R. at 342). She continued taking Suboxone. (*Id.*).

Plaintiff returned on May 27, 2010 and reported physical abuse by her boyfriend. (R. at 341). After throwing a chair at him she spent the day in jail. (*Id.*). She was still attending a drug and alcohol support group but had dropped out of school. (*Id.*). Her dosage of Suboxone was low and she was thinking of using narcotics again. (*Id.*).

Dr. Schollaert saw Plaintiff again on July 22, 2010. (R. at 339). Plaintiff told him that things were "going very well". (R. at 339). He continued the Suboxone therapy. (*Id.*).

---

[12]  "Subutex and Suboxone are medications approved for the treatment of opiate dependence. Both medicines contain the active ingredient, buprenorphine hydrochloride, which works to reduce the symptoms of opiate dependence." Subutex contains only buprenorphine hydrochloride while Suboxone contains an additional ingredient called naloxone to guard against misuse. Food and Drug Administration, Subutex and Suboxone Questions and Answers, *available at* http://www.fda.gov/Drugs/DrugSafety/PostmarketDrugSafetyInformationforPatientsandProviders/ucm191523.htm (last visited March 11, 2014).

### 4. Hypothyroidism

Plaintiff began treatment for hyperthyroidism with Fozia Chatta, M.D., in 2008. (R. at 350). She was prescribed Synthroid[13] to treat the condition. (R. at 350-351). Dr. Chatta advised that she would check her thyroid stimulating hormones ("TSH")[14] level again in six to eight weeks. (R. at 352). On June 30, 2009, Plaintiff's THS level was elevated and Dr. Chatta increased her dosage of Synthroid. (R. at 353). Although Plaintiff was emotional due to her miscarriage, she was doing well otherwise. (*Id.*). Plaintiff explained that she was unable to work due to her treatments for addiction and hepatitis C. (*Id.*). Her TSH level remained elevated on September 2, 2009 and her dosage of Synthroid was increased. (R. at 354). She returned on March 9, 2010 complaining of fatigue and depression. (R. at 355). Dr. Chatta noted that her most recent blood work showed normal TSH levels. (*Id.*). On July 29, 2010, Plaintiff told Dr. Chatta that she quit taking her medications but was starting to take them again. (R. at 356).

On July 30, 2010, Dr. Chatta signed a form entitled Pennsylvania Department of Public Welfare Employability Assessment ("the Disability Form"). (R. at 191). Section I of the form directed applicant to briefly explain why he/she believes that he/she cannot work. (*Id.*). Plaintiff wrote: "Anxity[sic]/depression, hyperthyroidism [sic] and I have an addiction problem which I take Suboxone for it. I have been on it for three years now." (*Id.*). In Section II, Dr. Chatta checked a box indicating that Plaintiff was temporarily disabled for twelve months or more. (R. at 192). She listed that the disability began August 1, 2008 and was expected to last until August

---

[13]  Synthroid (generic name "Levothyroxine") "is used to treat hypothyroidism." Mayo Clinic, Levothyroxine, *available at* http://www.mayoclinic.org/drugs-supplements/levothyroxine-oral-route/description/DRG-20072133 (last visited March 11, 2014).

[14]  "Diagnosis of hypothyroidism is based on your symptoms and the results of blood tests that measure the level of TSH and sometimes the level of the thyroid hormone thyroxine." Mayo Clinic, Hypothyroidism, *available at* http://www.mayoclinic.org/diseases-conditions/hypothyroidism/basics/tests-diagnosis/con-20021179 (last visited March 11, 2014).

1, 2011. (*Id.*). Under the heading "diagnosis," Dr. Chatta listed "Depression/Anxiety, S/P heroin addiction and Hypothyroidism."[15] Dr. Chatta indicated that this assessment was based upon physical examination, review of medical records, clinical history, and appropriate tests and diagnostic procedures. (*Id.*).

### C. Consultative Evaluations

#### 1. Physical Residual Functional Capacity Assessment

Abu N. Ali, M.D., completed a physical residual functional capacity ("RFC") assessment on June 6, 2009. (R. at 228-234). Dr. Ali assessed Plaintiff with the following exertional limitations: able to "stand and/or walk about 6 hours in an 8-hour workday" and able to "sit (with normal breaks) for a total of about 6 hours in an 8-hour workday." (R. at 229). Her only medically determinable impairment was a history of hepatitis C. (R. at 233). Treatment had generally been effective in controlling Plaintiff's alleged symptoms. (*Id.*). Dr. Ali found Plaintiff's statements regarding her symptoms and their effects on her functioning to be partially credible. (*Id.*).

#### 2. Mental Residual Functional Capacity Assessment

Jan Melcher, Ph.D., conducted a mental residual functional capacity assessment of Plaintiff on June 24, 2009. (R. at 235-237). As to Understanding and Memory, Plaintiff was found not to be significantly limited. (R. at 235). As to Sustained Concentration and Persistence, Plaintiff was assessed to be moderately limited in her abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number of length and rest periods. (*Id.*). As to Social Interaction, Plaintiff was found to be moderately limited in her abilities to: interact

---

[15] "S/P" stands for status post heroin addiction as set forth in Dr. Chatta's notes. (R. at 353).

appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 236). As to Adaption, Plaintiff was assessed to be moderately limited in her ability to respond appropriately to changes in the work setting. (*Id.*).

Based on this assessment, Dr. Melcher found that Plaintiff's basic memory processes were intact. (R. at 237). She was able to make simple decisions, maintain regular attendance and punctuality, ask simple questions, accept instructions, and could sustain a work routine without special supervision. (*Id.*). Plaintiff's symptoms were exacerbated by stress and she had a low tolerance for frustration. (*Id.*). Further, she was socially isolated and was limited in her ability to work under stress and contact with the public. (*Id.*). Dr. Melcher found that Plaintiff's statements were partially credible based upon the evidence of record. (*Id.*). Dr. Melcher opined that Plaintiff was able to meet the basic demands of competitive work on a sustained basis despite the aforementioned limitations. (*Id.*).

### 3. Psychiatric Review

Dr. Melcher completed a Psychiatric Review Technique based on Plaintiff's mental health records. (R. at 238). Dr. Melcher opined that Plaintiff had the following medically determinable mental impairments: ADHD, Obsessive Compulsive Personality Traits, Opiod Dependence, and Polysubstance Abuse. (R. at 239-246). Dr. Melcher found that Plaintiff had moderate limitations in her ability to maintain social functioning and in her ability to maintain concentration, persistence, or pace. (R. at 248).

### D. The Administrative Hearing

An administrative hearing was held before ALJ John Porter on October 15, 2010. (R. at 33). Plaintiff testified and was represented by counsel, Christine Nebel, Esq. (*Id.*). Vocational

expert, William Reed, Ph.D.,[16] also offered testimony. (*Id.*). Counsel asked that Plaintiff's onset date be amended to March 17, 2009, the date after the denial of Plaintiff's previous claim before the same ALJ. (*Id.*).

The evidence established that Plaintiff was born on October 4, 1976 and was thirty four years old[17] at the time of the hearing. (R. at 34). After finishing the ninth grade Plaintiff was homeschooled. (*Id.*). She earned her graduate equivalency degree ("GED") as well as an associate degree. (R. at 35). Later she attended Butler County Community College for medical coding but dropped out. (*Id.*). She was no longer attending school and had not worked since her alleged onset date. (R. at 35-36).

Plaintiff had a medical card and was able to get treatment. (R. at 36). She testified that she remained clean from drugs and alcohol since her alleged onset date. (*Id.*). Her former boyfriend, with whom she previously stayed on occasion, had been charged with growing marijuana. (R. at 37). Plaintiff acknowledged that her ex-boyfriend used illegal drugs while they were involved. (R. at 38). She explained that their relationship ended when she discovered that he was growing marijuana. (*Id.*). After she discovered the drugs the two had a physical altercation which resulted in both of them being charged with assault. (R. at 46).

She previously received psychiatric treatment at Glade Run but stopped attending because she "couldn't get up and stuff to go." (R. at 38). Plaintiff admitted that her condition was significantly improved prior to discontinuing treatment at Glade Run. (*Id.*). She quit attending her appointments after ending the relationship with her boyfriend. (R. at 38-39).

---

[16] William Reed holds a Ph.D. in Rehabilitation Counseling and Consulting from the University of Pittsburgh. (R. at 128). He has thirty years of experience providing testimony at administrative hearings. (*Id.*).

[17] The SSA's regulations define "Younger Person" as a person who is less than 50 years of age. 20 C.F.R. §§ 404.1563, 416.963.

Although she wanted to get a job, Plaintiff did not believe she could handle working. (R. at 39). She explained that she was scared of being around people and lacked confidence in her mental abilities. (R. at 40). Plaintiff no longer attended Narcotics or Alcoholics Anonymous. (R. at 43). Her mother made Plaintiff move out of her home the day after she was arrested for assaulting her boyfriend. (R. at 44). Her father later found a place for her to live. (R. at 44-45). Plaintiff was still receiving Suboxone treatment and consistently tested clean for illegal drugs. (R. at 45). She was currently taking Zoloft and was weaning herself off of Seroquel because it made her forgetful. (R. at 45-46).

Plaintiff testified that she never used marijuana but knew that her ex-boyfriend used it and they had physical fights when she caught him. (R. at 47). She had difficulty concentrating and suffered a miscarriage the previous year. (R. at 48). Plaintiff believed that if did have a job she would miss at least two days a week due to a lack of motivation. (R. at 48). It had been a long time since she worked and she dropped out of community college because she did not feel well enough to attend. (R. at 49, 50).

The vocational expert, Dr. Reed, summarized Plaintiff's work history as follows: restaurant server (medium exertion, unskilled) and merchandise processor (light to medium exertion, unskilled). (R. at 52). The ALJ posited a hypothetical individual:

> with the claimant's education, training, and work experience, and this person could work at any exertional level. But this person would be limited to simple, routine, repetitive work not performed in a fast-paced production environment. This person would be limited to incidental contact with co-workers and the public. So [the job would be] done essentially on her own. Contact with a supervisor one-sixth of the time.

(R. at 52). Dr. Reed opined that such an individual would not be able to perform Plaintiff's past work. (*Id.*). The hypothetical person would be able to perform the following positions: inventory clerk with 81,000 positions in the national economy (light, unskilled); housekeeping

engineer with 255,000 positions in the national economy (light, unskilled); janitor/cleaner with 1 million positions in the national economy (medium, unskilled). (R. at 52-53).

The ALJ inquired whether there would be any positions available if the individual missed two days a week due to a medically determinable impairment. (R. at 53). Dr. Reed responded that there would be no available work. (*Id.*). There were no conflicts between Dr. Reed's testimony and the Dictionary of Occupational Titles. (*Id.*). Plaintiff's counsel then asked Dr. Reed how many days an individual would be permitted to miss in a month and retain employment. (*Id.*). Dr. Reed explained that new employees were typically allowed two thirds of a day each month. (R. at 53).

## IV.   STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Comm'r of Soc. Sec.* 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541 (1988) (internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v.*

*Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability

unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S. Ct. 376 (2003) (footnotes omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject to judicial review under the "substantial evidence" standard. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *S.E.C. v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

Id. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247

F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D. Pa. 2005).

## V.    DISCUSSION

### A.    The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2011. (R. at 18). She had not engaged in substantial gainful activity since her amended onset date of March 17, 2009. (*Id.*). Plaintiff had the following severe impairments: hypothyroidism; hepatitis C; opioid dependence, in remission; depression; anxiety; attention deficit disorder; and below average intellectual functioning. (*Id.*). The ALJ found that none of these impairments, or a combination of impairments, met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1. (R.at 19). The ALJ thoroughly considered Plaintiff's mental and physical impairments. He found Plaintiff's Residual Functional Capacity[18] ("RFC") as follows:

> the claimant has the residual functional capacity to perform light work as defined in 20 § C.F.R. 404.1567(b) and 416.967(b) except she is limited to simple, routine, repetitive work, not performed in fast-paced production environment. The claimant is limited to incidental contact with coworkers and the public, and to jobs done essentially on her own, with contact with a supervisor limited to one-sixth (1/6) of the time.

(R. at 21). A discussion of the Plaintiff's alleged symptoms and the relevant evidence followed. (R. at 21-24).

The ALJ determined that although the evidence demonstrated that Plaintiff's impairments limited her functional abilities, she was not disabled within the meaning of the Act. (R. at 21-22). Plaintiff's hepatitis C infection was cured and she showed no signs of liver disease. (R. at 22). The record illustrated that Plaintiff's condition of hypothyroidism improved when Plaintiff

---

[18] RFC is defined by the regulations as "the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record." 20 C.F.R. § 416.945(a)(1).

was consistent with the recommended treatment. (*Id.*). Although Plaintiff was prescribed medication for depression the record indicated that she was not compliant in taking the medicine. (*Id.*).

The ALJ granted little weight to the Disability Form completed by Dr. Chatta, the physician who treated Plaintiff's thyroid condition. (R. at 22, 191-192). Dr. Chatta's conclusion that Plaintiff was disabled was not supported by medical evidence and consisted only of check marked boxes and the listing of three diagnoses. (*Id.*). Further, the ALJ found Dr. Chatta's assessment inconsistent with the record which showed that despite her situational stressors Plaintiff was doing relatively well. (R. at 22-23).

Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were found not credible to the extent they were inconsistent with the RFC assessment. (R. at 24). The ALJ observed that Plaintiff's symptoms were generally under control when she was compliant with her treatment regimen but she was admittedly not taking medication regularly or attending therapy. (*Id.*). The ALJ noted that a person "this ill would be expected to be taking medications and seeking mental health treatment consistently." (*Id.*).

The ALJ accorded great weight to Dr. Melcher's mental RFC assessment that Plaintiff was able to meet the basic mental demands of competitive work despite limitations stemming from her impairments. (R. at 24, 235-237). The limitations assessed by Dr. Melcher were found consistent with the record. (*Id.*). The physical RFC assessment completed by Dr. Ali was afforded some weight by the ALJ. (*Id.*). However, the ALJ found that the record supported some physical limitations in excess of those assessed by Dr. Ali. (*Id.*).

The ALJ found that Plaintiff was unable to perform any of her past relevant work. (R. at 25). She was born on October 4, 1976 and was thirty years old on her alleged onset date. (*Id.*).

Plaintiff had at least a high school education and was able to communicate in English. (*Id.*). The transferability of job skills was not an issue because Plaintiff's past relevant work was unskilled. (*Id.*). The ALJ concluded that considering Plaintiff's age, education, work experience, and residual functional capacity, there were jobs she could perform existing in significant numbers in the national economy. (*Id.*). Plaintiff was found able to perform the jobs of stock clerk, with 81,000 positions existing nationally, and housekeeper/cleaner, with 255,000 positions existing nationally. (*Id.*).

The ALJ noted that exertional limitations were not included in the hypothetical he posited to the vocational expert. (R. at 26). He concluded that Plaintiff could perform light work activity as set forth in the aforementioned RFC assessments. (*Id.*). The ALJ found this consistent with the vocational expert's testimony that Plaintiff could perform light work. (*Id.*). Finally, the ALJ determined that Plaintiff had not been under a disability, as defined under the Act, from October 7, 2006 through the date of his decision. (*id.*).

**B.     Plaintiff's Objections to the Decision of the ALJ**

On appeal before to this Court Plaintiff raises several objections to the ALJ's decision. (ECF No. 18). Plaintiff argues that the ALJ: (1) erred in disregarding the medical opinion of Dr. Chatta; (2) erred in determining Plaintiff's RFC; (3) erred in disregarding the vocational expert's testimony and relied on an incomplete hypothetical; and (4) was biased against Plaintiff. (*Id.* at 7-13). Defendant counters that the ALJ's decision was supported by substantial evidence. (ECF No. 22). For the reasons that follow, Plaintiff's objections are without merit.

**1.     The ALJ's Discussion of Medical Evidence**

Plaintiff argues that the ALJ erred by according little weight to the Disability Form completed by Dr. Chatta. (ECF No. 18 at 7). The Court disagrees. The Disability Form

consisted of a checked box that Plaintiff was temporarily disabled for twelve months or more. (R. at 191-192). Dr. Chatta listed only three diagnoses: "Depression/Anxiety, S/P heroin addiction, hypothyroidism." (R. at 192).

The determination of whether Plaintiff is disabled is reserved to the Commissioner and a physician's opinion on that issue is not entitled to controlling weight. S.S.R. 96-5P, 1996 WL 374183, at *5. "A statement by a medical source that you are 'disabled' or unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. §§ 404.1527(d), 416.927(d). In completing the Disability Form, Dr. Chatta did not assess any limitations or judgment regarding the nature and severity of Plaintiff's impairments. (R. at 22, 191-192); §§ 404.1527(a)(2), 416.927(a)(2).

The ALJ provided further rationale for discounting the Disability Form submitted by Dr. Chatta, noting that it lacked supporting explanation. (R. at 22-23, 191-192). The ALJ may accord more or less weight to an opinion depending on whether supporting explanations were provided. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). The Disability Form consisted of check marked boxes and a list of Plaintiff's diagnoses. (R. at 191-192). Form reports which consist merely of check marked boxes are weak evidence at best. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). Although the Disability Form indicates that it was based on physical examination, review of medical records, clinical history, and appropriate tests and diagnostic procedures, Dr. Chatta provided no specific details. (R. at 22-23, 191-192).

In addition to lacking supporting explanation and identified limitations, the assessment of Dr. Chatta, who only treated Plaintiff for her thyroid condition, was inconsistent with the record. (R. at 22-23, 191-192). The opinions of treating physicians are generally entitled to substantial and potentially controlling weight. *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001);

S.S.R. 96-5P, 1996 WL 374183, at *4. In order to be granted greater weight the medical opinions must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and…not inconsistent with the other substantial evidence in [the] case record." §§ 404.1527(c)(2); 416.927(c)(2). The ALJ is entitled to weigh the entirety of the record in making his finding. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). "Where … the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason of the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d. Cir. 2000) (internal quotations omitted). The ALJ must consider medical evidence in conjunction with the rest of the relevant evidence in the record and may assign a non-treating physician's opinion greater weight if it is supported by the record. 20 C.F.R. §§ 404.1527(b), 416.927(b); Brown, 649 F.3d at 196.

The ALJ correctly observed that the treatment notes of Dr. Schollaert, Plaintiff's internal medicine doctor, were inconsistent with the conclusion of Dr. Chatta, Plaintiff's thyroid doctor, that Plaintiff was disabled. (R. at 22, 204-206). Dr. Schollaert opined that Plaintiff's depression consistently improved while he was treating her for heroin addiction. (R. at 204-206, 339, 341-342, 345). During her final visit[19] to Dr. Schollaert on July 22, 2010, Plaintiff said that "things [were] going very well." (R. at 22-23, 339).

Dr. Humphreys, the board certified psychiatrist at Glade Run, who treated Plaintiff from August 2008 through June 2010, noted on August 27, 2008 that Plaintiff's mood was euthymic and her cognitive function was within normal limits. (R. at 22-23, 200). Plaintiff denied any symptoms from severe depression. (*Id.*). Although Plaintiff reported periods of anger and racing thoughts she told Dr. Humphreys that her "life is good" on August 13, 2009. (R. at 334). In

---

[19] Plaintiff contacted Dr. Schollaert by phone two more times after this visit regarding a false pregnancy test. (R. at 339).

November 2009, Plaintiff told Dr. Humphreys that school was "better" and she was not as moody. (R. at 321). Moreover, her hypothyroidism was under control and she had tested negative for hepatitis C. (R. at 217-220, 350-355).

Dr. Chatta's conclusion that Plaintiff is disabled was also inconsistent with her own treatment notes. (R. at 21-22). A physician's opinion which is inconsistent with the doctor's own treatment notes may be granted less weight. *Rimel v. Astrue*, 521 F. App'x 57, 59 (3d Cir. 2013). On June 20, 2009, Dr. Chatta noted that Plaintiff was emotional after suffering a miscarriage but "otherwise has been doing well." (R. at 22-23, 353). In light of the aforementioned inconsistencies, the ALJ properly granted little weight to the Disability Form completed by Dr. Chatta.

In passing, Plaintiff argues that the ALJ erred by ignoring the GAF score of 48 assessed by Dr. Humphreys. (ECF No 18 at 8); (R. at 201, 332). The Court is not persuaded by this argument. "An ALJ's failure to include a GAF score in his or her discussion is considered to be harmless error where a claimant has not explained how the GAF score would have itself satisfied the requirements for disability in light of potentially contradictory evidence on record." *Bracciodieta-Nelson v. Comm'r. of Soc. Sec.*, 782 F. Supp. 2d 152, 165 (W.D. Pa. 2011). GAF scores do not have a direct correlation to the Act's severity requirements. *Gilroy v. Astrue*, 351 F. App'x 714, 715 (3d Cir. 2009). "[A] GAF score of 45, if credited, would not require a finding of disability." *Id. See also Rios v. Comm'r of Soc. Sec.*, 444 F. App'x 532, 535 (3d Cir. 2011) (holding that the ALJ did not commit reversible error by failing to discuss two GAF scores). Accordingly, the ALJ did not err by omitting a discussion of the GAF score.

## 2. The ALJ's RFC Assessment

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence because the ALJ erred by not assigning controlling weight to the evaluations by Dr. Chatta, Dr. Humphreys, and Dr. Meyers and Dr. Uran, the psychologists who tested Plaintiff's IQ. (ECF No. 18 at 10). Specifically, Plaintiff contends that substantial evidence does not support a finding that she is mentally able to do the work outlined in the RFC. (*Id.*). This argument is unavailing and contrary to the evidence. A claimant's RFC is assessed "based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1). The ALJ must consider all relevant evidence when formulating an RFC but need only include those limitations which are credibly established. *Garret v. Comm'r of Soc. Sec.*, 274 F. App'x. 159, 163 (3d Cir. 2008). Relevant evidence for the purpose of determining a claimant's RFC includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli*, 247 F.3d at 43. A treating physician's opinion does not inevitably control the ALJ's assessment of the claimants RFC. *Brown v. Astrue*, 649 F.3d 193, 196, n. 2 (3d Cir. 2011). Determinations of credibility are in the province of the ALJ. *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

The ALJ completed a thorough review of the relevant evidence and concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her mental and physical symptoms were not credible to the extent they were inconsistent with his RFC assessment. (R. at 24). For the aforementioned reasons, the ALJ's decision not to grant substantial weight to the Disability Form signed by Dr. Chatta and the evaluation notes

completed by Dr. Humphreys was supported by substantial evidence. The ALJ did not err by formulating an RFC which omitted that evidence.

Plaintiff's argument that the ALJ failed to incorporate the IQ scores assessed by Dr. Meyers and Dr. Uran (Full Scale IQ= 78, Verbal IQ= 76, Performance IQ= 85) also lacks merit. The ALJ found the results of the IQ test inconsistent with Plaintiff's completion of a GED and an associates' degree. (R. at 22). Despite these inconsistencies the ALJ accommodated them in his RFC, limiting Plaintiff to "simple, routine, repetitive work, not performed in a fast-paced environment." (R. at 21). This is consistent with the conclusion of Dr. Meyers and Dr. Uran that Plaintiff is "slow in assimilating new information." (R. at 377). Accordingly, the ALJ gave adequate consideration to the IQ scores and incorporated them into his RFC.

### 3. The ALJ's Hypothetical

Plaintiff argues that the ALJ improperly disregarded the vocational expert's testimony and relied upon an incomplete hypothetical. (ECF No. 18 at 12-13). The Court is not persuaded by Plaintiff's argument. The hypothetical in this case was based on the credible evidence presented. (R. at 52).

Hypotheticals posited to a vocational expert need not include limitations that have not been credibly established or those in conflict with the record. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). The ALJ is not required to "submit to the vocational expert every impairment alleged by a claimant." *Id.* Based on Plaintiff's testimony, the ALJ asked the vocational expert whether a person who missed two or more days of work per week would be able to find employment, to which he responded in the negative. (R. at 53). Limitations of this severity were not credibly established. *See Van Horn*, 717 F.2d at 873. Further, the ALJ properly noted that Plaintiff's symptoms were generally under control when she is consistent

with her prescribed treatment. (R. at 24). Accordingly, the ALJ's decision to disregard Plaintiff's alleged limitations was supported by substantial evidence.

### 4. Alleged Bias of the ALJ

Plaintiff contends that the ALJ granted less weight to Dr. Humphreys' notes and the Disability Form due to bias stemming from evidence of drug use by Plaintiff's ex-boyfriend. (ECF No. 18 at 12). This argument is without merit. After hearing the evidence presented at the hearing, the ALJ noted the additional medical and treatment records that he expected to receive. (R. at 54). The ALJ commented that when Plaintiff adhered to her treatment program and made responsible decisions she can be employed and was doing well. (*Id.*).

ALJ: All right. Ms. Nebel, I believe we need to get the Suboxone treatment records and the primary care physician's records.

ATTY: Yes, Your Honor, within 20 days.

ALJ: All right, we'll do that for sake of completeness, but I imagine the Suboxone records are going to show that she's showing up and getting her treatment, and she's clean.

ATTY: Right.

ALJ: And the primary care physician and her – I haven't heard anything about any major problems. So, I will look for those, and I will give them a careful look. And I haven't made my mind up yet but, Ms. Kiefer, what the evidence seems to show me is that you are a person who is capable of making something out of your life, and that you can be employed, and that your trouble stems from not following what you learned in the program of not staying away from people places and things. I can't believe that you can be in a relationship with someone who's dealing drugs and growing marijuana and not know that they were doing that, especially since you do have or should have a heightened sensitivity to that kind of thing.

And it seems like the evidence seems to show me that you were doing well, and if you stuck with the program you could have a productive life.

So, I'm very reluctant to assign someone like you to receiving disability checks for the rest of your life, because I don't think the evidence shows that. But I will give it careful consideration. I'll look at the evidence that

you submit and make a final decision when I get all the evidence in. But that's all we need to do today. We'll conclude the hearing.

(R. at 54-55).

Due process dictates that claimants must be given a full and fair hearing. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d. Cir. 1995). A fair hearing is necessarily free of bias. *Id.* The right to a hearing free from bias is of particular importance in social security hearings because of the role that the ALJ must play in developing the record. *Id.* The ALJ is presumed to be unbiased. *Maher v. Astrue*, Civ. A. No. 8-1561, 2009 WL 3152467, *4 (W.D. Pa. Sept. 30, 2009). "A party asserting bias must show that the behavior of the ALJ was 'so extreme as to display clear inability to render fair judgment.'" *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)). Contrary to Plaintiff's argument, the ALJ granted less weight to the disability report because it expressed an opinion on an issue reserved to the Commissioner, lacked support, and was inconsistent with the record. (R. at 22-23); *See* §§ 404.1527; 416.927. Similarly, the ALJ was not required to consider the GAF score assessed by Dr. Humphreys in reaching his determination. *See Bracciodieta-Nelson,* 782 F. Supp. 2d at 165. Further, there is no indication the ALJ failed to develop the record or prevent testimony during the hearing. The Court is unconvinced that the ALJ's closing statement evidenced any bias. In fact, it appears to evidence a concern for and encouragement of Plaintiff.

## VI.    CONCLUSION

For the reasons set forth herein, the decision of the ALJ denying Plaintiff's claims is "supported by substantial evidence." 42 U.S.C. § 405(g). It is respectfully recommended that Plaintiff's motion for summary judgment (ECF No. 17) be denied, that the Defendant's motion for summary judgment (ECF No. 21) be granted, and that the Commissioner's decision be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193, n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

BY THE COURT:


/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

Dated: April 1, 2014

cc:     All counsel of record